SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. A.M. (A-56-21) (087057)**
**State v. Eddie L. Oliver (A-57-21) (087088)**

**Argued September 13, 2022 -- Decided January 9, 2023**

**RABNER, C.J., writing for the Court.**

In these consolidated appeals, the Court considers whether the Compassionate Release Act (CRA), enacted in 2020, gives judges discretion to deny compassionate release to inmates who satisfy the statute's medical and public safety requirements.

The CRA, N.J.S.A. 30:4-123.51e, expressly repealed the medical parole statute, under which the State Parole Board could release inmates diagnosed with a terminal condition or permanent physical incapacity under certain circumstances. The CRA replaced medical parole with a streamlined process to apply for compassionate release. The Act also expanded the prior law's criteria for eligibility and transferred the power to grant release from the Parole Board to the courts.

If an inmate is diagnosed with a terminal condition or permanent physical incapacity as defined in the CRA, the Department "shall promptly issue to the inmate a Certificate of Eligibility for Compassionate Release" with which the inmate may then seek compassionate release. See id. at (d)(2) to (3). Inmates "shall serve a copy of the petition" on the prosecutor in the matter. Id. at (e)(1). And the prosecutor must "notify the victim or family member of the opportunity to present a statement at the hearing on the petition or to testify to the court." Id. at (e)(2).

The CRA provides that "the court may order the compassionate release of an inmate who has been issued a Certificate of Eligibility . . . if the court finds by clear and convincing evidence that [1] the inmate is so debilitated or incapacitated by the terminal condition, disease or syndrome, or permanent physical incapacity as to be permanently physically incapable of committing a crime if released and, [2] in the case of a permanent physical incapacity, the conditions established in accordance with [N.J.S.A. 30:4-123.51e(h)] under which the inmate would be released would not pose a threat to public safety. Id. at (f)(1) (emphasis added).

The basic facts in A.M.'s case are not in dispute. A.M. fatally shot her husband in May 2010 and was convicted of first-degree murder and a weapons

1

offense.  In March 2021, following diagnoses of end-stage multiple sclerosis by two physicians, the Commissioner of the Department of Corrections issued a Certificate of Eligibility for Compassionate Release for A.M.  A.M. filed a petition with the court, which the State opposed.  The State advised the court that A.M.'s children intended to testify against her release at a hearing, as did the victim's mother.

The trial court denied A.M.'s petition for release.  The court found that A.M.'s remaining period of parole ineligibility did not bar compassionate release under the CRA; that A.M. had established by clear and convincing evidence that she had a "permanent physical incapacity" within the meaning of the Act; and that conditions of release "likely could be established" to assure that she "would not pose a risk to public safety."  The trial court, however, concluded that compassionate release was not mandatory when those conditions were met.  The Appellate Division reversed, holding that once those factors are met, a trial court has no discretion to deny relief.  State v. A.M., 472 N.J. Super. 51, 57 (App. Div. 2022).  The Court granted certification.  251 N.J. 199 (2022).

The Court refers to the defendant in State v. Eddie Oliver by the name he uses, Al-Damany Kamau.  In 1993, Kamau shot and killed a detective in an Essex County courthouse to prevent him from testifying in a criminal case.  Defendant also shot and wounded two other officers, attempted to kill a third official, and planned to kill the judge.  A jury convicted Kamau of one count of first-degree murder and three counts of attempted murder.  In September 2021, two physicians examined Kamau in prison.  Based on their findings, the Department of Corrections issued a Certificate of Eligibility for Compassionate Release for Kamau in November 2021.  He filed a petition for release two months later, which the State and the victims opposed.  Explaining the tensions between the statutory limits placed on the disclosure of medical information in N.J.S.A. 30:4-123.51e(e)(4) and the interest of public access to information, the Court limits its description of Kamau's medical condition and asks the Legislature to review the confidentiality provision in (e)(4).

The trial court denied Kamau's petition.  The court found that Kamau had a permanent physical incapacity and would not pose a threat to public safety if released.  The court nonetheless explained that subsection (a) of the CRA affords judges discretion to deny relief even when an applicant meets the law's medical and public safety factors.  The court declared that Kamau had "committed perhaps one of the most heinous, brutal, bold, cold-blooded premeditated murders ever committed in Essex County" and denied the petition.  Kamau appealed, and the Court granted direct certification.  251 N.J. 209 (2022).

**HELD:**      *Based on the text of the new statute and its legislative history, the Court concludes the Compassionate Release Act affords judges discretion to deny relief, in exceptional circumstances, even if the law's medical and public safety

2

conditions are satisfied. In individual cases, when the medical and public safety factors are met, courts can assess whether extraordinary aggravating factors exist that justify the denial of compassionate release. That high standard comports with the Legislature's goal to make greater use of compassionate release. Absent any such circumstances, petitions for relief should be granted.

*In the first appeal, <u>State v. A.M.</u>, the record does not present extraordinary aggravating circumstances. The Court therefore modifies and affirms the Appellate Division's judgment to release A.M.

*The second appeal, <u>State v. Eddie L. Oliver</u>, involves the kind of extraordinary aggravating circumstances that justify denying relief. The Court therefore modifies and affirms the trial court's judgment and denies defendant's petition for release.

1. The CRA states that judges "may release" and "may order" compassionate release when an inmate meets the law's medical and public safety conditions. N.J.S.A. 30:4-123.51e(a), (f)(1). The word "may" generally conveys that an action is permissive, not mandatory, but "may" and "shall" "have been held to be interchangeable whenever necessary to execute the clear intent of the Legislature. Here, the Appellate Division correctly found that the use of "may" in the CRA vests courts with the authority to decide petitions for compassionate release -- a responsibility previously reserved to the State Parole Board. <u>A.M.</u>, 472 N.J. Super. at 72-73. But allocating power to judges does not by itself reveal whether they must grant or have discretion to deny relief when an inmate satisfies the law's medical and public safety conditions. Nor do the introductory clauses in subsections (a) and (f)(1) deprive the court of discretion or call for judges to grant relief. Subsection (e)(2), meanwhile, expressly mandates that victims and family members be allowed to testify about any harm they suffered. Considering that mandate, as well as constitutional and statutory rights accorded to crime victims, the Court concludes that the CRA cannot be read to require courts to grant compassionate release when only the medical and public safety conditions are met. The Court reviews closely the CRA's legislative history, which also signals that the law's use of "may" is permissive, not mandatory. (pp. 22-30)

2. For all of those reasons, the Court finds that when trial judges evaluate a request for compassionate release, they must consider (1) whether there is clear and convincing evidence that an inmate "is so debilitated" by a specified medical condition "as to be permanently physically incapable of committing a crime if released"; (2) whether, in the case of an inmate with a "permanent physical incapacity," there is clear and convincing evidence that the inmate "would not pose a threat to public safety" if released under the conditions imposed; and (3) testimony or statements from victims and family members about "any harm" they "suffered."

3

N.J.S.A. 30:4-123.51e(e)(2), (f)(1). Consistent with the text and history of the statute, trial courts have discretion to decide whether to release an inmate who meets the first two requirements. (pp. 30-31)

3. Turning to the question of <u>how</u> trial courts should exercise their discretion under the CRA, the Court notes that the structure and history of the new law reveal that the Legislature intended to expand the use of compassionate release. The CRA outlined a more expedited process for compassionate release. It also removed certain barriers from the medical parole statute it replaced, signaling intent to broaden the number of inmates who could apply for and be granted compassionate release. (pp. 31-33)

4. A standard to limit discretion under the CRA should further the purposes of the statute and provide for uniformity and overall fairness. Relying on certain core aims of the CRA -- to expand the use of compassionate release for inmates with serious medical conditions; to eliminate categorical bars to relief; to protect public safety; and to consider the harm suffered by victims -- the Court holds that inmates who are not disqualified under the Act's medical and public safety criteria should be granted compassionate release unless one or more extraordinary aggravating factors exist.

Trial judges, for example, may consider whether an offense involved any of the following extraordinary circumstances: (1) particularly heinous, cruel, or depraved conduct; (2) a particularly vulnerable victim, based on the person's advanced age, youth, or disability; (3) an attack on the institutions of government or the administration of justice; and (4) whether release would have a particularly detrimental effect on the well-being and recovery process of victims and family members. For the fourth factor, courts should apply a standard of objective reasonableness.

The standard is a necessarily high one -- whether <u>extraordinary</u> aggravating factors exist. Such factors cannot be used as a substitute for all serious crimes. They are limited to exceptional and rare circumstances to comport with the statute's goal of increasing the use of compassionate release. Absent one or more extraordinary aggravating factors, inmates who are otherwise eligible should be granted compassionate release. The Court does not rely on the factors outlined in <u>State v. Priester</u>, 99 N.J. 123 (1985), to guide the trial court's discretion. (pp. 33-37)

5. Applying that standard in A.M.'s case, the Court observes that the trial court's findings that A.M. satisfies the statute's medical and public safety requirements are supported by substantial credible evidence in the record. Although A.M.'s crime is an inherently serious one, the law no longer bars inmates convicted of murder from seeking compassionate release, and there are no extraordinary aggravating factors that would bar her release. Consistent with the CRA, her petition should therefore be granted. (pp. 37-38)

4

6.  In Kamau's case, the trial court's findings that he suffers from a permanent physical incapacity and would not pose a threat to public safety upon release are supported by substantial credible evidence in the record.  Kamau was convicted of murder and three counts of attempted murder.  In the commission of those offenses, he executed a plot against the justice system itself.  Kamau's crime presents the type of extraordinary aggravating circumstances that justify denying relief.  His petition for release is therefore denied.  (pp. 38-39)

**The judgments under review are MODIFIED and AFFIRMED.**

**JUSTICES PATTERSON, SOLOMON, and PIERRE-LOUIS, and JUDGE SABATINO (temporarily assigned) join in CHIEF JUSTICE RABNER's opinion.  JUSTICE FASCIALE did not participate.**

SUPREME COURT OF NEW JERSEY

A-56 September Term 2021

A-57 September Term 2021

087057 and 087088

State of New Jersey,

Plaintiff-Appellant,

v.

A.M.,

Defendant-Respondent.

State of New Jersey,

Plaintiff-Appellant,

v.

Eddie L. Oliver, a/k/a Damany Al Kamua,

Defendant-Respondent.

State v. A.M. (A-56-21):
On certification to the Superior Court,
Appellate Division, whose opinion is reported at
472 N.J. Super. 51 (App. Div. 2022).

State v. Eddie L. Oliver (A-57-21):
On appeal from the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| September 13, 2022 | January 9, 2023 |

Tiffany M. Russo, Assistant Prosecutor, argued the cause for appellant in State v. A.M. (A-56-21) (Robert J. Carroll, Morris County Prosecutor, attorney; Tiffany M. Russo, on the briefs).

Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for appellant in State v. Eddie L. Oliver (A-57-21) (Theodore N. Stephens, II, Acting Essex County Prosecutor, attorney; Frank J. Ducoat, of counsel and on the briefs).

Alison Gifford, Assistant Deputy Public Defender, argued the cause for respondent A.M. in State v. A.M. (A-56-21) and respondent Eddie L. Oliver in State v. Eddie L. Oliver (A-57-21) (Joseph E. Krakora, Public Defender, attorney; Alison Gifford, of counsel and on the briefs).

Angela Cai, Deputy Solicitor General, argued the cause for amicus curiae Attorney General of New Jersey in State v. A.M. (A-56-21) and State v. Eddie L. Oliver (A-57-21) (Matthew J. Platkin, Acting Attorney General, attorney; Angela Cai and Lauren Bonfiglio, Deputy Attorney General, of counsel and on the brief).

Dyanne Veloz Lluch argued the cause for amicus curiae New Jersey Crime Victims' Law Center in State v. A.M. (A-56-21) and State v. Eddie L. Oliver (A-57-21) (New Jersey Crime Victims' Law Center, attorneys; Richard D. Pompelio, of counsel and on the brief, and Dyanne Veloz Lluch, on the brief).

Daniel D. Barnes argued the cause for amicus curiae V.M. in State v. A.M. (A-56-21) (Chiesa Shahinian & Giantomasi, attorneys; Daniel D. Barnes, on the brief).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey in State v. A.M. (A-56-21) and State v. Eddie L. Oliver (A-57-21) (American Civil Liberties Union of New Jersey

2

Foundation, attorneys; Alexander Shalom and Jeanne LoCicero, on the brief).

Barry Evenchick argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey in State v. A.M. (A-56-21) and State v. Eddie L. Oliver (A-57-21) (Pashman Stein Walder Hayden, attorneys; CJ Griffin on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

The Legislature enacted the Compassionate Release Act, N.J.S.A. 30:4-123.51e, in 2020.  The new law provides for the release of inmates who suffer from a medical condition so severe that they are incapable of committing a crime and, in certain cases, would not pose a threat to public safety if released.

In these consolidated appeals, we consider whether the Act gives judges discretion to deny compassionate release to inmates who satisfy two requirements in the statute:  its medical and public safety conditions.

The new law was designed to expand the use of compassionate release. Inmates convicted of certain serious crimes could not apply for relief under the prior statute, and fewer than five people were released from about 2015 to 2019.  In place of the old law, the Legislature enacted a statute that applies to all inmates; even individuals convicted of murder are eligible to apply.  The statute also outlines a streamlined process to obtain relief.  Those measures reflect the Legislature's intent to show compassion to people with serious

3

medical needs, decrease the prison population, and reduce healthcare costs for correctional facilities.

The Act requires judges to evaluate an inmate's medical condition and, in certain situations, to decide whether the person would pose a threat if released.  Id. at (f)(1).  But before judges can rule on petitions for release, the law calls on them to assess a third factor:  any harm suffered by victims and their family members.  Id. at (e)(2), (3), (7).  Based on the text of the statute and its legislative history, we conclude the law affords judges discretion to deny relief, in exceptional circumstances, even if the first two factors are satisfied.

We also offer guidance to trial courts on how to exercise their discretion. In individual cases, when the medical and public safety factors are met, courts can assess whether extraordinary aggravating factors exist that justify the denial of compassionate release.  That high standard comports with the Legislature's goal to make greater use of compassionate release.  Absent any such circumstances, petitions for relief should be granted.

Defendants in both appeals were convicted of murder.  Both have serious medical conditions; they are permanently bedridden, unable to perform basic activities of daily life, and require round-the-clock care.  They pose no realistic threat to public safety if released.

4

In the first appeal, State v. A.M., the Appellate Division ordered defendant's release. Her offense was both serious and tragic: she killed her spouse, a beloved father to their three minor children at the time. The record, however, does not present extraordinary aggravating circumstances. We therefore modify and affirm the Appellate Division's judgment to release A.M.

In the second appeal, State v. Eddie L. Oliver, defendant murdered a detective in a courthouse to prevent him from testifying in a criminal case. Defendant also shot and wounded two other officers, attempted to kill a third official, and planned to kill the judge. Because the case involves the kind of extraordinary aggravating circumstances that justify denying relief, we modify and affirm the trial court's judgment and deny defendant's petition for release.

## I.

We carefully reviewed the Compassionate Release Act (CRA or Act) for the first time in State v. F.E.D., 251 N.J. 505 (2022). We begin with a brief overview of the Act again to provide relevant background information for these appeals.

The Act expressly repealed the medical parole statute, formerly codified at N.J.S.A. 30:4-123.51c. See L. 2020, c. 106, § 3. Under that statute, the State Parole Board could release inmates diagnosed with a terminal condition

or permanent physical incapacity under certain circumstances. N.J.S.A. 30:4-123.51c(a)(2) (repealed 2020).

The CRA replaced medical parole with a streamlined process to apply for compassionate release. The Act also expanded the prior law's criteria for eligibility and transferred the power to grant release from the Parole Board to the courts. N.J.S.A. 30:4-123.51e.

The Act calls on the Commissioner of Corrections to "establish and maintain a process" for inmates to "obtain a medical diagnosis" from two licensed physicians, designated by the Commissioner, to determine whether inmates are "eligible for compassionate release." Id. at (b). The medical diagnosis must include a description of the inmate's condition, a prognosis about "the likelihood of recovery," a description of the person's "physical incapacity," and "a description of the type of ongoing treatment . . . required if the inmate is" released. Id. at (b)(1) to (4).

The law defines three conditions that can trigger further action: (1) a "[g]rave medical condition," meaning the inmate either has more than 6 and up to 12 months to live, or has a condition that "for at least 3 months has rendered the inmate unable to perform activities of basic daily living" and has required 24-hour care; (2) a "terminal condition, disease, or syndrome," meaning the "inmate has 6 months or less to live"; and (3) a "[p]ermanent physical

6

incapacity," meaning the inmate is "permanently unable to perform activities of basic daily living," requires 24-hour care, and did not have the condition "at the time of sentencing." Id. at (*l*).

In the case of an inmate with a grave medical condition, "the Department of Corrections shall promptly notify the inmate's attorney or, if the inmate does not have an attorney, the Public Defender," in anticipation of the person's condition deteriorating. Id. at (d)(1). Only inmates in the second and third categories -- those with a terminal condition or permanent physical incapacity -- can be considered for compassionate release. Id. at (d)(2).

If an inmate is diagnosed with a terminal condition or permanent physical incapacity, the Department "shall promptly issue to the inmate a Certificate of Eligibility for Compassionate Release." Ibid. With that certificate, the inmate "may petition the court for compassionate release" or ask the Public Defender to do so. Id. at (d)(2) to (3).

Several provisions of the law that follow are central to these appeals. First, the law provides that inmates "shall serve a copy of the petition" on the County Prosecutor or Attorney General, depending on who prosecuted the matter. Id. at (e)(1). The prosecutor, in turn, "shall provide notice of the petition to any victim or member of the family of a victim entitled to notice under the [Parole Act, N.J.S.A. 30:4-123.45 to .76]." Id. at (e)(2). More

7

specifically, prosecutors must "notify the victim or family member of the opportunity to present a statement at the hearing on the petition or to testify to the court concerning any harm suffered by the victim or family member at the time of the hearing." Ibid. (emphases added).

Within 15 days of receiving notice, victims and family members can submit comments and advise the court that they intend to testify at the hearing. Id. at (e)(3). Prosecutors also have 15 days to respond to the petition, which can "be extended to 30 days for good cause." Id. at (e)(6). If the prosecutor objects to the petition or notifies the court "that a victim or a family member intends to testify to the court at the hearing, the court shall hold a hearing . . . on an expedited basis." Id. at (e)(7). Otherwise, the court can rule on the application without a hearing. Ibid.

Second, the Act outlines the following standard:

> Notwithstanding the provisions of [N.J.S.A. 30:4-123.53(a)], the court may order the compassionate release of an inmate who has been issued a Certificate of Eligibility for Compassionate Release pursuant to [N.J.S.A. 30:4-123.51e(d)(2)] if the court finds by clear and convincing evidence that [1] the inmate is so debilitated or incapacitated by the terminal condition, disease or syndrome, or permanent physical incapacity as to be permanently physically incapable of committing a crime if released and, [2] in the case of a permanent physical incapacity, the conditions established in accordance with [N.J.S.A. 30:4-

8

123.51e(h)] under which the inmate would be released would not pose a threat to public safety.

[Id. at (f)(1) (emphasis added).]

We refer to the two criteria as the "medical" and "public safety" factors or conditions.

Subsection (f)(1) mirrors the Act's introductory language: "Notwithstanding any provision of [the Parole Act, N.J.S.A. 30:4-123.45 to .76] to the contrary, the court may release an inmate who qualifies under this section for compassionate release at any time during the term of incarceration." Id. at (a) (emphasis added).

When an inmate is granted release, "the court shall require, as a condition precedent to release," that the Parole Board "ensure . . . the inmate's release plan includes . . . identification of a community sponsor" and "verification of . . . appropriate medical services . . . and . . . housing." Id. at (h)(1) to (3). The Parole Board may impose additional conditions, including "periodic medical diagnoses by a licensed physician." Id. at (i). If an inmate's medical condition improves or the person poses a threat to the public, the inmate can be "return[ed] . . . to confinement." Id. at (j).

We review a trial court's factual findings about an inmate's medical condition to see "whether they are supported by substantial credible evidence in the record." F.E.D., 251 N.J. at 525. A trial court's assessment of public

9

safety issues, as well as its decision to grant or deny compassionate release, is reviewed for abuse of discretion. See State v. F.E.D., 469 N.J. Super. 45, 66 (App. Div. 2021). Legal determinations about the meaning of the CRA are reviewed de novo. F.E.D., 251 N.J. at 526.

## II.

The basic underlying facts in A.M.'s case are not in dispute. A.M. fatally shot her husband on May 22, 2010. According to evidence presented at trial, A.M. and her husband experienced marital difficulties in the months leading up to the murder. They discussed getting a divorce, and A.M. contacted an attorney. In April, she reached out to a friend several times and asked how to get a gun -- legally as well as illegally. When that failed, she hired a locksmith to open her husband's safe and removed his gun. She later used it to shoot him.

On the night of the murder, A.M. and her husband argued about money. She also told him she intended to report his allegedly inappropriate actions with one of their daughters.[1] A.M. testified that her husband became furious,

---

[1] On direct appeal, the Appellate Division observed that "the evidence demonstrated the abuse never occurred." In addition, in April 2010, the Division of Youth and Family Services (DYFS) investigated a similar allegation A.M. had leveled. DYFS concluded the abuse allegations were unfounded.

10

and she shot him more than once as he approached her. When one of their three children entered the room and saw her father on the floor, A.M. said he was drunk and had fallen. Hours later, she called 9-1-1 and admitted she shot her husband.

After a ten-day trial, a jury convicted A.M. of first-degree murder and second-degree possession of a weapon for an unlawful purpose. The trial judge sentenced A.M. to an aggregate term of forty years in prison, with thirty-four years of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2.

The presentence report noted that A.M. "was diagnosed with multiple sclerosis [MS] in 2005," had lost the use of her legs and left arm, and required constant medical assistance. A.M.'s conviction and sentence were affirmed on direct appeal.

In December 2020, two physicians separately examined A.M. and diagnosed her with progressive end-stage MS. The doctors noted she was "completely dependent on nursing care for [activities of daily living]," was bedridden, and required round-the-clock care. Her prognosis was "poor and progressive." A Managing Physician employed by the Department of Corrections reviewed the reports and concluded that A.M.'s medical condition

11

"would be fatal in the near future" or amounted to a "permanent physical disability."

The Commissioner of the Department of Corrections issued a Certificate of Eligibility for Compassionate Release for A.M. on March 15, 2021. A.M. then filed a petition with the court, which the State opposed. The State also advised the court that A.M.'s children intended to testify against her release at a hearing. The State did not dispute that A.M. was physically incapacitated; it objected on the ground that A.M. had MS at the time of sentencing, contrary to the requirements of N.J.S.A. 30:4-123.51e(*l*).

The trial court conducted three days of hearings. The first two days focused on A.M.'s medical condition. A neurologist who first examined A.M. in 2013 testified that her condition had advanced from "relapsing-remitting" MS, marked by transient episodes of weakness and vision loss as well as periods of recovery, to progressive end-stage MS, when there are no longer any periods of partial recovery and the patient experiences a steady decline in neurological functions. The neurologist added that A.M. was unable to move except for the limited use of one hand, was bedridden, had experienced a progressive loss of vision, and had difficulty expressing herself.

The trial court credited the testimony and found that A.M.'s condition was "materially different from what it was" eight years earlier at sentencing.

12

The court observed "[t]here has been a material change" and concluded that A.M. "met her burden to establish that her current condition did not exist at the time of sentencing." See N.J.S.A. 30:4-123.51e(*l*).

The victim's daughters, V.M. and A.M., his son, N.M., and his mother testified on the third day of the hearing. All of them opposed A.M.'s release. The children, now young adults, portrayed A.M. as an abusive and absent mother in contrast to their loving, engaged father. The family members described the trauma they suffered as a result of the murder and said that, if A.M. were released, they "would feel . . . grief . . . all over again." They added that A.M. had shown no remorse for her crime and no compassion for its effect on their lives.

In a detailed written opinion, the trial court denied A.M.'s petition for release. The court found that A.M.'s remaining period of parole ineligibility did not bar compassionate release under the CRA; that A.M. had established by clear and convincing evidence that she had a "permanent physical incapacity" within the meaning of the Act; and that conditions of release "likely could be established" to assure that she "would not pose a risk to public safety."

The trial court, however, concluded that compassionate release was not mandatory when those conditions were met. Because subsection (f)(1) of the

13

CRA states that trial judges "may order" compassionate release, the court looked to the factors outlined in State v. Priester, 99 N.J. 123 (1985), to guide its exercise of discretion. We discuss Priester further below. In conducting a balancing test, the trial court gave greater weight to factors that counseled against release and accordingly denied A.M.'s petition.

The Appellate Division reversed. State v. A.M., 472 N.J. Super. 51 (App. Div. 2022). It found that the phrase "may order" compassionate release in subsections (a) and (f)(1) of the CRA, viewed in context, "vest[ed] the courts with authority to make compassionate release" decisions, which had previously been the responsibility of the Parole Board. Id. at 74. In the appellate court's view, the language did not address how courts should exercise that authority. Ibid.

The Appellate Division explained that, in A.M.'s case, subsection (f)(1) lists only two conditions that determine whether she should be released: whether she suffers from a permanent physical disability, as defined in the Act, and whether she "would not pose a threat to public safety" if released. Id. at 75-76. The appellate court held that once those factors are met, a trial court has no discretion to deny relief. Id. at 57. Opposition from victims and family members, the Appellate Division observed, is to be considered only in connection with the above two conditions. Id. at 79.

14

We denied the State's motion to stay the judgment of the Appellate Division, 251 N.J. 201 (2022), and granted the State's petition for certification, 251 N.J. 199 (2022).  The following week, consistent with the Appellate Division's judgment, the trial court issued an order releasing A.M. from custody.

We granted leave to appear as amici curiae to the American Civil Liberties Union of New Jersey (ACLU), the Association of Criminal Defense Lawyers of New Jersey (ACDL), the Attorney General of New Jersey, V.M. (the victim's daughter), and the New Jersey Crime Victims' Law Center.

III.

A.

We refer to the defendant in State v. Eddie Oliver by the name he uses, Al-Damany Kamau, with his preferred spelling.  To recount the facts, we rely primarily on the transcript of defendant's hearing for compassionate release.

In 1993, Kamau shot and killed Newark Police Detective John Sczyrek inside the Essex County Veterans Courthouse.  Detective Sczyrek was about to testify in a criminal case in which Kamau's brother and cousin were on trial.  An employee with the probation office, Tinesha James, smuggled a handgun into the courthouse for Kamau and passed it to him.  Kamau used it to murder Detective Sczyrek as he waited to enter the courtroom.

15

While attempting to escape, Kamau shot Essex County Sheriff's Officer Ralph Rizzolo, Jr. in the chest and injured him. Kamau also shot at and injured Officer Thomas King, and fired at Jacinto Rivera, a security guard. The investigation revealed that Kamau planned to kill the trial judge as well.

A jury convicted Kamau of one count of first-degree murder and three counts of attempted murder. The jury did not agree unanimously on whether to sentence him to death. The trial judge then sentenced Kamau, in the aggregate, to life imprisonment with a 75-year period of parole ineligibility. His conviction was affirmed on appeal.

In September 2021, two physicians examined Kamau in prison. They diagnosed him with a serious medical condition and reported that he suffered from a "terminal condition," with less than six months to live, as well as a "permanent physical incapacity." Based on those findings, the Department of Corrections issued a Certificate of Eligibility for Compassionate Release for Kamau on November 4, 2021. He filed a petition for release two months later, which the State and the victims opposed.

### B.

A hearing was held on Kamau's petition on February 14, 2022. Before discussing the hearing, we note that the CRA states that "information contained in the petition and the contents of any comments submitted by a

recipient in response . . . shall be confidential and shall not be disclosed to any person who is not authorized to receive or review the information or comments." N.J.S.A. 30:4-123.51e(e)(4). The statute does not expressly address testimony in open court at a hearing on a petition.

In F.E.D., we highlighted a challenge the law presents. Court records are generally open to the public. R. 1:38-1. "Records required to be kept confidential by statute," however, are not. R. 1:38-3(a). As a result, if a court details a defendant's medical condition in a compassionate release proceeding, it cannot identify the defendant by name. See F.E.D., 251 N.J. at 536. In those instances, the public at large will not be made aware of the case, even in matters of great public interest.

Kamau's case is a prime example. It garnered extensive media coverage at the time of the offense, and the public has an interest in knowing about later developments. The case also raises a practical concern in that it is not possible to describe the offense meaningfully without identifying the defendant unless the facts are sterilized.

To promote transparency, we identify Kamau by name but limit our description of his specific medical condition. Because it is largely undisputed that Kamau suffers from a condition that qualifies as a permanent physical incapacity under subsection (*l*), it is not essential to describe the medical

17

evidence before the Court in detail.[2]  In disputed cases, however, that will not ordinarily be possible.  Indeed, in A.M.'s case, the State contests whether defendant's current medical condition existed at the time of sentencing, so we discuss her condition in greater detail and use initials to ensure confidentiality.

In the interest of open public access to information, we ask the Legislature to review the confidentiality provision in subsection (e)(4).  See id. at 537.

C.

At the hearing on Kamau's petition, the trial court heard testimony from a physician who oversees medical treatment at the Department of Corrections, as well as testimony from the victims and their family members.

The physician relied on reports from the two examining physicians and testified that Kamau suffered from a serious medical condition, was bedridden, immobile, unable to carry out activities of daily living, and required 24-hour care.  The physician agreed that Kamau had a "permanent physical incapacity" and a "terminal condition" within the meaning of the CRA.  Although the latter definition applies to inmates who have six months or less to live, the physician explained "[i]t could be possible" for Kamau to live longer.

---

[2]  At the hearing, the State argued it was possible Kamau's condition might improve, without pointing to evidence for support.

The court also heard from Officer Rizzolo, Officer King, and Detective Sczyrek's surviving spouse and brother. All opposed Kamau's release. Officer Rizzolo testified that he had been shot in the chest, ran to the courtroom, and collapsed -- thinking he was about to die. He lost a lung as a result of the shooting. Officer King recounted how he followed Kamau down a stairwell, and how Kamau pointed a gun at King's head and fired. The officer was hit by shrapnel and suffered hearing loss and other lasting injuries. Cheryl Sczyrek, Detective Sczyrek's widow, spoke about how she learned of her husband's murder and how it affected her and their two-year-old daughter, whom she raised as a single mother. Stanley Sczyrek, the Detective's brother, relayed that he felt the impact of his brother's murder every day. He added that if Kamau were "let out of prison," the family would "have no sense of security."

The trial court denied Kamau's petition. The court agreed with the State that Kamau did not meet the criteria for a "terminal condition" because of "non-committal" testimony about whether he had six months or less to live. Instead, the court found that Kamau had a permanent physical incapacity and would not pose a threat to public safety if released.

The court nonetheless explained that subsection (a) of the CRA affords judges discretion to deny relief even when an applicant meets the law's

medical and public safety factors. The court declared that Kamau had "committed perhaps one of the most heinous, brutal, bold, cold-blooded premeditated murders ever committed in Essex County" and denied the petition.

Kamau appealed, and we granted the State's motion for direct certification. 251 N.J. 209 (2022). We also granted joint motions for leave to appear to the amici in A.M.'s appeal.

IV.

The positions of the parties and amici in these appeals divide along the following line: whether the CRA requires judges to grant compassionate release, or leaves them discretion to deny relief, when a defendant has satisfied the Act's medical and public safety conditions.

A.M. and Kamau contend the Act does not give courts discretion once the statutory criteria in subsection (f)(1) are met. Along with the ACLU and ACDL, defendants argue the Appellate Division in A.M. properly interpreted the CRA in light of the law's plain language and legislative history. As a result, defendants argue they are both entitled to relief.

The State and the Attorney General take the opposite position. They argue that the text, structure, and history of the CRA demonstrate that judges have discretion to deny relief even when subsection (f)(1)'s threshold

20

eligibility determinations are satisfied. They, as well as V.M. and the Crime Victims' Law Center, submit that the testimony of crime victims and family members, who have a right to be heard under the Act, would otherwise be meaningless.

To guide the trial court's discretion, the State in A.M. commends the use of the factors outlined in Priester, which are designed to assess motions for release under Rule 3:21-10(b)(2). The Attorney General instead proposes that, if an individual satisfies the CRA's medical and public-safety requirements, there should be a presumption of release that can be overcome only in "extraordinary circumstances that would render release a serious injustice." In both appeals, the State argues that defendants are not entitled to be released.

V.

To interpret the meaning of the Act, we rely on familiar principles of statutory construction.

The goal of "statutory interpretation is to 'determine and give effect to the Legislature's intent.'" State v. Lopez-Carrera, 245 N.J. 596, 612 (2021) (quoting In re Registrant H.D., 241 N.J. 412, 418 (2020)). Courts begin with the language of a statute, "which is typically the best indicator of intent." State v. McCray, 243 N.J. 196, 208 (2020) (quoting In re T.B., 236 N.J. 262, 274 (2019)).

21

Words and phrases in a statute should not be read in isolation. Instead, we read them in context, along "with related provisions[,] . . . to give sense to the legislation as a whole." DiProspero v. Penn, 183 N.J. 477, 492 (2005).

When the text of a statute is clear, the court's job is over. Lopez-Carrera, 245 N.J. at 613. If the language is ambiguous, courts can turn to extrinsic materials to determine the Legislature's intent. Ibid. Legislative history, committee reports, and other sources can "serve as valuable interpretive aid[s]" in those instances. In re Ridgefield Park Bd. of Educ., 244 N.J. 1, 19 (2020) (alteration in original) (quoting State v. Drury, 190 N.J. 197, 209 (2007)); In re DiGuglielmo, 252 N.J. ___, ___ (2022) (slip op. at 11).

## VI.

These appeals pose two key questions: Does the trial court have discretion to deny compassionate release if an inmate satisfies the Act's medical and public safety conditions? And, if it does, how should a court exercise that discretion? We consider each issue in turn.

## A.

We begin with the language of the CRA to address the first question. Once again, subsections (a) and (f)(1) of the Act state that judges "may release" and "may order" compassionate release when an inmate meets the law's medical and public safety conditions. N.J.S.A. 30:4-123.51e(a), (f)(1).

1.

The word "'may' generally conveys that an action is permissive, not mandatory." Myers v. Ocean City Zoning Bd., 439 N.J. Super. 96, 101 (App. Div. 2015). The term "ordinarily reflects an intent to confer discretionary authority." Linden Democratic Comm. v. City of Linden, 251 N.J. 415, 428 (2022) (quoting State v. Ercolano, 335 N.J. Super. 236, 244 (App. Div. 2000)). "Must" and "shall," by contrast, "are generally mandatory." Harvey v. Essex Cnty. Bd. of Freeholders, 30 N.J. 381, 391 (1959).

Neither "may" nor "shall," however, "have an exclusive . . . [or] fixed" meaning. Norman J. Singer & J.D. Shambie Singer, 3 Sutherland on Statutory Construction § 57:10 (8th ed. 2022). The term's "meaning in particular cases is determined from the intent of the legislature as shown by the context within which the word appears." Ibid.; see also Ercolano, 335 N.J. Super. at 244 (noting that the rule that "may" ordinarily conveys discretion "is merely an aid in determining probable legislative intent"). As a result, "may" and "shall" "have been held to be interchangeable whenever necessary to execute the clear intent of the Legislature." Harvey, 30 N.J. at 392.

In Harvey, for example, this Court reviewed a statement of purpose attached to a bill and concluded that the Legislature intended the word "may" in the law to have a mandatory meaning. Id. at 392-93. The Court reached a

23

similar conclusion in <u>Linden</u> after examining a statute's overall structure and legislative history. 251 N.J. at 429-35.

Here, the Appellate Division correctly found that the use of "may" in the CRA vests courts with the authority to decide petitions for compassionate release -- a responsibility previously reserved to the State Parole Board. <u>A.M.</u>, 472 N.J. Super. at 72-73. But the decision to transfer control from the Parole Board to the courts does not necessarily convey how judges should exercise their newfound authority. In other words, allocating power to judges does not by itself reveal whether they must grant or have discretion to deny relief when an inmate satisfies the law's medical and public safety conditions.

Nor do the introductory clauses in subsections (a) and (f)(1) deprive the court of discretion. In both places, the Act states that, "[n]otwithstanding" other provisions in the Parole Act, the court "may release" and "may order" compassionate release. That language simply means the CRA trumps other limits on parole eligibility. An example appears in subsection (f)(1) of the Act: inmates not eligible for parole because of their failure to cooperate in their own rehabilitation, <u>see</u> N.J.S.A. 30:4-123.53(a), are not barred from seeking compassionate release, <u>see</u> N.J.S.A. 30:4-123.51e(f)(1). But the "notwithstanding" clauses do not call for judges to grant relief.

As noted earlier, to determine the Legislature's intent, courts read words and phrases in context. We examine them along with related provisions and in light of a statute's overall scheme. Lopez-Carrera, 245 N.J. at 615; DiProspero, 183 N.J. at 492. Here, we consider the meaning of the term "may" in light of another provision of the CRA: subsection (e)(2). The subsection requires prosecutors to "notify the victim or family member of the opportunity to present a statement at the hearing on the petition or to testify to the court concerning any harm suffered by the victim or family member at the time of the hearing." N.J.S.A. 30:4-123.51e(e)(2). The Act thus expressly mandates that victims and family members be allowed to testify about any harm they suffered. Ibid.

The language the Legislature used in subsection (e)(2) is instructive. It reveals that in addition to the medical and public safety conditions described in subsection (f)(1), victim testimony is relevant to the ultimate question whether to grant compassionate release. Otherwise, testimony from victims would be little more than a potentially cathartic but hollow exercise; victims could speak, but their words would have little if any effect. Such an approach would not be faithful to the law's text. Nor would it be faithful to the State Constitution.

25

Article I, Paragraph 22 of the State Constitution provides that victims of "crime shall be treated with fairness, compassion and respect by the criminal justice system." N.J. Const. art. I, ¶ 22. Certain statutes implement that principle. They also demonstrate how "changes in the law [have] steadily strengthened the rights of victims to participate in criminal proceedings." State v. Tedesco, 214 N.J. 177, 195 (2013).

Among other statutes, the Crime Victim's Bill of Rights, N.J.S.A. 52:4B-34 to -38, enacted before the Victim's Rights Amendment to the Constitution, outlines certain rights that are relevant here: the right to make "an in-person statement directly to the sentencing court concerning the impact of the crime," id. at -36(n); and the right "[t]o appear in any court before which a proceeding implicating the rights of the victim is being held, with standing to file a motion or present argument on a motion filed to enforce any right conferred" by the statute or the Constitution, id. at -36(r).

In the same manner, subsection (e)(2) of the CRA grants victims rights when inmates file for compassionate release, including the right to submit a statement or testify about the impact of an offense and any continuing effects. Subsection (e)(2) contains no language that limits a victim's testimony -- or the court's consideration of that testimony -- to an inmate's medical condition, public safety concerns, or conditions of release, as defendants and amici

26

suggest. See N.J.S.A. 30:4-123.51e(e)(2); see also A.M., 472 N.J. Super. at 78-79. And reading the statute in that way would make little practical sense. Victims generally know very little about an inmate's medical condition. They are not privy to medical reports or details about an inmate's physical condition in prison. Also, in the case of an inmate with a terminal condition, disease, or syndrome that renders him "permanently physically incapable of committing a crime," the Act does not require courts to separately determine whether the person would "pose a threat to public safety" if released. N.J.S.A. 30:4-123.51e(f)(1).

Because the Act requires judges to hear a victim's testimony about any harm they have suffered, the law cannot be read to require courts to grant compassionate release when only two other conditions are met.[3] The testimony of victims and their family members is a third consideration courts must weigh, alongside findings about an inmate's medical condition and public safety concerns.

---

[3] A.M. points to California's medical release statute, which a divided intermediate appellate court concluded requires the release of an inmate if the law's medical and public safety conditions are met. See People v. Torres, 261 Cal. Rptr. 3d 844, 850 (Cal. Ct. App. 2020). The California statute, however, does not require judges to hear and consider victim testimony, see Cal. Penal Code § 1170(e), and does not reflect New Jersey's legislative history.

27

The CRA's legislative history also signals that the law's use of "may" is permissive, not mandatory. Two sources in particular are revealing.

The Legislature based the CRA on a recommendation of the New Jersey Criminal Sentencing & Disposition Commission. See S. Judiciary Comm. Statement to S. 2594 1 (Aug. 24, 2020). In a report issued in 2019, the Commission proposed replacing the medical parole statute with a new program called "compassionate release." N.J. Crim. Sent'g & Disposition Comm., Annual Report 30 (Nov. 2019). The Commission called for a new "release mechanism" to "allow inmates to obtain prompt release if they are suffering from a terminal medical condition or permanent physical incapacity." Ibid.

The Commission reviewed the now-repealed medical parole law, N.J.S.A. 30:4-123.51c, and observed that the statute was "well-intentioned" but "rarely used." Id. at 32. In the five years leading up to the report, "fewer than [five] inmates ha[d] been released." Ibid. The Commission "recommend[ed] that the Legislature establish similar standards for inmates seeking Compassionate Release, but with additional mechanism[s] to facilitate . . . prompt release." Id. at 31.

Under the proposal, inmates with a grave medical condition could get counsel; inmates with a terminal condition or permanent physical incapacity

could obtain a certificate of eligibility and then file a petition for release in the Superior Court.  Ibid.  After a hearing, the Commission explained, "the court could order the inmate's release" if the certificate was valid and the inmate met the medical parole statute's other eligibility criteria relating to medical and public safety concerns.  Ibid. (emphasis added).

The Legislature also used permissive language to describe the court's responsibility.  In 2020, the Legislature considered a draft of the later-enacted law that established a compassionate release program.  S. 2594/A. 2370 (2020).  In a statement accompanying the draft bill, the Senate Judiciary Committee explained that a "court could order the compassionate release of an inmate" under the bill "if it finds by clear and convincing evidence that" the law's medical and public safety conditions are met.  S. Judiciary Comm. Statement to S. 2594 2-3 (emphasis added).

Both the Sentencing Commission and the Legislature thus used discretionary language to describe the release decision:  courts "may" or "could" order release, not "must" or "shall."  Therefore, although "may" and "shall" can be used interchangeably in some settings depending on legislative

29

intent, the legislative history here reveals an intent to read the word "may" in subsections (a) and (f)(1) to convey a permissive meaning.[4]

3.

For all of those reasons, we find that when trial judges evaluate a request for compassionate release, they must consider (1) whether there is clear and convincing evidence that an inmate "is so debilitated" by a specified medical condition "as to be permanently physically incapable of committing a crime if released"; (2) whether, in the case of an inmate with a "permanent physical incapacity," there is clear and convincing evidence that the inmate "would not pose a threat to public safety" if released under the conditions imposed; and (3) testimony or statements from victims and family members about "any harm" they "suffered." N.J.S.A. 30:4-123.51e(e)(2), (f)(1). Consistent with

---

[4] Our analysis does not rely on an attempt in 2015 to amend the medical parole statute and replace "may release" on medical parole with "shall release." A. 4337 (2015); see also A. Appropriations Comm. Statement to A. 4337 1 (June 15, 2015) ("The bill requires the board panel to release an inmate on medical parole if the inmate meets the criteria designated under current law and the provisions of this bill."). Governor Chris Christie vetoed the amendment. Governor's Veto Statement to A. 4337 (Nov. 9, 2015).

The parties, with the Attorney General aligned with the State, disagree over the meaning of the proposed change. The matter, however, relates to a different law that the CRA replaced, an amendment drafted by a different Legislature, and a veto by a different Governor. Under the circumstances, we do not place weight on the veto.

the text and history of the statute, trial courts have discretion to decide whether to release an inmate who meets the first two requirements.

B.

In light of that conclusion, we turn to the second question: how trial courts should exercise their discretion under the CRA. Once again, the structure and history of the new law offer important guidance. They reveal that the Legislature intended to expand the use of compassionate release through the CRA.

1.

The new law, as noted earlier, stemmed from a recommendation of the Sentencing Commission. Among other changes, the Commission proposed an additional diagnosis -- a "grave medical condition" -- and a streamlined process "to facilitate an inmate's application and prompt release." N.J. Crim. Sent'g & Disposition Comm., at 31-32. The Report noted the changes "would likely increase the number of ill patients released from custody" and "result in significant cost-savings for" the Department of Corrections. Id. at 33.

The Legislature adopted the recommendation. See S. 2594/A. 2370 (2020). As described in section I, the Act outlined a more expedited process for compassionate release. It also removed certain barriers from the medical parole statute it replaced.

31

Under the prior law, defendants convicted of the following serious offenses were not eligible for medical parole:  murder, manslaughter, kidnapping, aggravated sexual assault, first-degree robbery, aggravated arson, endangering the welfare of a child, or an attempt to commit any of those offenses.  N.J.S.A. 30:4-123.51c(a)(3) (repealed 2020).

The CRA eliminated the statutory bar for those crimes.  N.J.S.A. 30:4-123.51e.  With that change, the Legislature signaled its intent to broaden the number of inmates who could apply for and be granted compassionate release.

Governor Phil Murphy signed the bill into law on October 19, 2020.  An accompanying press release included statements from the Act's sponsors about the law's purpose.  They explained that "[b]y expanding upon what already exists we can show true compassion to those with profound medical needs."  Gov. Phil Murphy, Press Release, Governor Murphy Signs Sentencing Reform Legislation (Oct. 19, 2020) (joint statement of Assemblypersons Gary Schaer and Verlina Reynolds-Jackson).  The sponsors also echoed goals the Sentencing Commission had espoused, noting that the program's "clear guidelines . . . will allow us to reduce [prison] capacity, and alleviate financial strains" on an "already overcrowded prison system" "while getting medically vulnerable residents the care they need outside of prison."  Ibid.

32

Those measures and the reasons underlying them reveal that the CRA was designed to make greater use of compassionate release.

2.

This is not the first time the Court has been called on to address a statute that gives criminal trial judges discretionary authority but does not provide specific standards to channel the court's discretion. In State v. Yarbough, for example, the Court set forth criteria to help trial judges determine "whether sentences for multiple offenses are to be served consecutively or concurrently." 100 N.J. 627, 630 (1985).[5] Although there were no specific criteria in the Code of Criminal Justice, N.J.S.A. 2C:1-1 to 98-4, the Court drew guidance from "the Code's paramount sentencing goals" as well as the need for "a predictable degree of uniformity" in the judicial system. Id. at 630, 636-37. More recently, in State v. Torres, the Court also stressed the importance of "overall fairness" to guide the application of the Yarbough factors. 246 N.J. 246, 267-68 (2021).

We look to the same guiding principles here. Standards to limit discretion should "best further the purposes of the" CRA and provide for uniformity and overall fairness. See Yarbough, 100 N.J. at 636; Torres, 246

___

[5] See also State v. Dunbar, 108 N.J. 80, 90-91 (1987) (addressing the standard for the trial court's discretionary decision whether to impose an extended term of imprisonment on a persistent offender under N.J.S.A. 2C:44-3).

N.J. at 267-68.  In that regard, we look to certain core aims of the Act:  to expand the use of compassionate release for inmates with serious medical conditions; to eliminate categorical bars to relief; to protect public safety; and to consider the harm suffered by victims.

In light of those principles, courts may not exercise discretion in a way that creates de facto categorical barriers to release and overrides legislative intent.  In the simplest of examples, judges cannot deny compassionate release on the ground that an inmate committed a "serious offense," because the Legislature has extended eligibility to inmates convicted of all offenses.

Indeed, we recognize that many if not most applicants for relief will have committed serious offenses.  Aging inmates in failing health, who are serving lengthy sentences for serious crimes, will petition for relief.  Yet even inmates convicted of the most serious offense of first-degree murder, which provides for a sentence up to life imprisonment with a mandatory minimum period of 30 years without parole, see N.J.S.A. 2C:11-3(b), are now eligible for early release.

Similarly, the statute's overall aims do not invite a broad array of factors that might justify the denial of relief.  Such an approach would run counter to the law and its history, which favor the release of inmates with serious, permanent illnesses that render them incapable of committing crimes.

34

We conclude that inmates who are not disqualified under the Act's medical and public safety criteria should be granted compassionate release unless one or more extraordinary aggravating factors exist. Trial judges, for example, may consider whether an offense involved any of the following extraordinary circumstances: (1) particularly heinous, cruel, or depraved conduct; (2) a particularly vulnerable victim, based on the person's advanced age, youth, or disability; (3) an attack on the institutions of government or the administration of justice; and (4) whether release would have a particularly detrimental effect on the well-being and recovery process of victims and family members. For the fourth factor, courts should apply a standard of objective reasonableness.

In outlining those criteria, we draw from the goals of the CRA as well as guidance from an analogous setting -- select criteria in the Criminal Code that help determine whether to withhold or impose a sentence of imprisonment.[6]

The above standard is a necessarily high one -- whether <u>extraordinary</u> aggravating factors exist.[7] Such factors cannot be used as a substitute for all

---

[6] The above principles derive, in part, from N.J.S.A. 2C:44-1(a)(1) to (2). We do not draw from the complete list of aggravating factors in N.J.S.A. 2C:44-1(a).

[7] We decline to impose a presumption of release if an inmate satisfies the medical and public safety conditions, as the Attorney General suggests. In

35

serious crimes. They are limited to exceptional and rare circumstances to comport with the statute's goal of increasing the use of compassionate release. Absent one or more extraordinary aggravating factors, inmates who are otherwise eligible should be granted compassionate release.

As in other areas, appellate review will help protect against the inappropriate exercise of judicial discretion. See Torres, 246 N.J. at 267.

We do not rely on the Priester factors to guide the trial court's discretion. Priester outlined factors for courts to balance when deciding whether to grant relief under Rule 3:21-10(b)(2). 99 N.J. at 135-37. That Rule addresses motions to "amend[] a custodial sentence to permit the [early] release of a defendant because of illness or infirmity." R. 3:21-10(b)(2). Among other factors, Priester calls on courts to consider "the serious nature of the defendant's illness and the deleterious effect of incarceration on the prisoner's health"; "the availability of medical services in prison"; "the nature and severity of the crime, the severity of the sentence, the criminal record of the defendant, [and] the risk to the public if the defendant is released." 99 N.J. at 135-37. Inmates must also show "a change of circumstances" in their health "since the time of the original sentence." Id. at 136.

---

accordance with the Act, release should not be presumed before a trial court considers victim testimony. See N.J.S.A. 30:4-123.51e(e)(2).

36

The CRA itself encompasses a number of those factors, such as the nature of the inmate's illness, the risk to public safety, and whether there has been a change in circumstances in the inmate's health. Certain other factors are at odds with the Act, namely, the nature of the crime and the severity of the sentence. As a result, we do not import the Priester factors to evaluate motions for compassionate release.

## VII.

To provide additional guidance, we apply the above standard in both matters.

## A.

The trial court found that A.M. suffers from a permanent physical incapacity and that conditions of release could be established to assure that she "would not pose a threat to public safety." See N.J.S.A. 30:4-123.51e(f)(1). Both findings are supported by substantial credible evidence in the record. See F.E.D., 251 N.J. at 525-26.

The State challenges the trial court's conclusion that A.M.'s medical condition "did not exist at the time of sentencing." See N.J.S.A. 30:4-123.51e(*l*). That finding is also supported by substantial credible evidence. A treating neurologist who had examined A.M. in 2013 testified about the

material change in her condition -- from relapsing-remitting MS to progressive end-stage MS.

Finally, A.M.'s crime was without question a most serious offense. She deliberately murdered her husband, and her children offered heartfelt testimony in opposition to her release. But the law no longer bars inmates convicted of murder from seeking compassionate release. Although A.M.'s crime is an inherently serious one, there are no extraordinary aggravating factors that would bar her release. Consistent with the CRA, her petition should therefore be granted.

## B.

The trial court found that Kamau did not have a terminal condition. The court found he suffers from a permanent physical incapacity and would not pose a threat to public safety upon release.[8] Substantial credible evidence supports those findings. See F.E.D., 251 N.J. at 525-26.

The State also contends that defendant's failure to provide evidence related to his post-release plan provides an alternative basis to deny relief. See

---

[8] In reviewing the evidence, the trial court said it was "unlikely that [Kamau] would post a threat if he were to be released," and that "[h]e does appear to be so sick that he probably would not be able to pose any kind of danger to the public at this point in time." The State challenges the adequacy of the finding. We note that findings by courts should more closely follow the standard in subsection (f)(1). For reasons that follow, however, it is not necessary to remand for a clearer statement of findings here.

N.J.S.A. 30:4-123.51e(h). The trial court did not consider the question. In light of our disposition of Kamau's appeal, we need not address the issue and decline to do so in the first instance.

We focus instead on the existence of any extraordinary aggravating factors. Kamau was convicted of murder and three counts of attempted murder. In the commission of those offenses, he executed a plot against the justice system itself. Kamau murdered a law enforcement officer inside a courthouse to prevent him from testifying against members of Kamau's family. He shot and wounded two other officers, attempted to kill a third, and planned to kill the judge as well. Kamau's crime presents the type of extraordinary aggravating circumstances that justify denying relief. His petition for release is therefore denied.

## VIII.

For those reasons, we modify and affirm the judgment of the Appellate Division in A.M. and the judgment of the trial court relating to Kamau.


JUSTICES PATTERSON, SOLOMON, and PIERRE-LOUIS, and JUDGE SABATINO (temporarily assigned) join in CHIEF JUSTICE RABNER's opinion. JUSTICE FASCIALE did not participate.